**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maria Urrego de SOTO, Gustavo Chaverra Cardona, and Ruth Urrego Chaverra, Defendants–Appellants.**

Nos. 87–2400 to 87–2402.

United States Court of Appeals,
Seventh Circuit.

Argued and Submitted April 14, 1989.

Decided Sept. 6, 1989.

Rehearing Denied Nov. 29, 1989.

Steven Short, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., David J. Stetler, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Chicago, Ill., for the U.S.

Steven B. Muslin, Michael Wilkie, Chicago, Ill., for Maria deSoto.

M. Jacqueline Walther, Kielian & Walther, Chicago, Ill., for Gustavo C. Cardona.

Lannie A. Pollans, Chicago, Ill., for Ruth U. Chaverra.

Before CUDAHY, POSNER and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The defendants—Gustavo Chaverra Cardona, Ruth Urrego Chaverra, and Maria Urrego de Soto—appeal their convictions for various drug trafficking offenses; a jury found each defendant guilty of conspiring to distribute cocaine in violation of 21 U.S.C. § 846 and of several counts of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The defendants appeal on a multitude of grounds. We affirm.

## I

### FACTS

A tangled web of actions, spun by the three defendants and a number of their associates in a north Chicago neighborhood over the course of 1986, forms the basis of the case now before us. The three defendants are all related to each other: Gustavo Chaverra Cardona and Ruth Urrego Chaverra are husband and wife, and Maria Urrego de Soto is Ruth Urrego Chaverra's sister.[1] Other participants in the conspiracy were also closely tied to the defendants by bonds of family or friendship: Alvaro Chaverra (Alvaro) is Mr. Chaverra's brother and Ramon Sanchez (Sanchez) is a close associate of the family members. Also involved in the organization was Fanny Bertha Altamirano, who served in the Chaverra and de Soto homes as a housekeeper, and later became a principal government witness in the case against her former employers. The locations used by the conspiracy were proximate to each other. The conspiracy operated out of three primary households: (1) Alvaro's apartment at 5752 North Campbell Avenue, which served as a stash house; (2) Ms. de Soto's apartment at 5812 North Campbell Avenue, which served as a meeting place to carry out the transactions; and (3) Mr. and Mrs. Chaverra's former home at 5306 North California Avenue. (Just prior to Mr. Chaverra's arrest, the Chaverras moved to a new home at 5143 North Oakley Avenue.)

In August 1984, Mrs. Altamirano started working as a housekeeper for the Chaverras. Ms. de Soto often came to visit her sister and brother-in-law's home, and thus Mrs. Altamirano came to know Ms. de Soto as well. After becoming acquainted, Ms. de Soto occasionally hired Mrs. Altamirano to do household chores at her home. In early 1986, Mrs. Altamirano testified, she came to notice large amounts of cash in the Chaverra home. This money was stacked in a closet to which Mr. Chaverra would go often, and alone, during each day; she also noticed a safe in a closet of another room. By the month of May 1986, Mrs. Altamirano began to see even larger amounts of cash in the Chaverra home. For example, she saw Mrs. Chaverra and Ms. de Soto counting stacks of money and separating them by denomination. At Ms. de Soto's apartment, Mrs. Altamirano witnessed sim-

---

1. In this opinion, we shall refer to Gustavo Chaverra Cardona as Mr. Chaverra, Ruth Urre-go Chaverra as Mrs. Chaverra, and Maria Urre-go de Soto as Ms. de Soto.

ilar activity—once, the money counting occurred immediately before the visit of a woman named Mona, who was a friend of Ms. de Soto's. Another time, while she was cleaning Ms. de Soto's dresser, Mrs. Altamirano found a box containing a white powdery substance. Mrs. Altamirano later observed Ms. de Soto sell the powder to an unidentified man for $900.

Mrs. Altamirano was not simply a detached observer of the goings-on in the Chaverra and de Soto homes. She herself sold cocaine, supplied by Mrs. Chaverra, to a confidential informer. Sometime in early May 1986, this confidential informer introduced undercover FBI Agent Gregorio Rodriguez to Mrs. Altamirano. After negotiations, she agreed to sell cocaine to Agent Rodriguez—then known to her as Jorge Castro. On May 28, Agent Rodriguez met Mrs. Altamirano to purchase a sample of the cocaine that she said she could provide through her Colombian employers—the Chaverras. He paid her $150, and she entered the Chaverra home; a short time later, Mrs. Altamirano returned with a small packet of cocaine. Mrs. Altamirano testified that Mrs. Chaverra provided her with the cocaine and instructed her to use the code word "movies" for any future cocaine purchases. On May 30, Agent Rodriguez arranged another purchase through Mrs. Altamirano. First, she called Mrs. Chaverra and told her she wanted a "movie"; then, Agent Rodriguez gave her $1,200 to buy an ounce of cocaine. At 3:00 p.m., Mrs. Altamirano went into the Chaverra house and soon returned to Agent Rodriguez' car with a plastic bag containing 28 grams of 93 percent pure cocaine. Mrs. Altamirano testified that Mrs. Chaverra provided her with the cocaine and that Mrs. Chaverra gave her $50 for arranging the deal.

On June 3, Agent Rodriguez again met with Mrs. Altamirano to buy another ounce of cocaine. They again drove to the same area, Agent Rodriguez paid $1,200, and Mrs. Altamirano went into the Chaverra home. On this occasion, however, the transaction did not proceed as smoothly as on May 30. Upon entering the Chaverra home, Mrs. Altamirano was told by Mrs.

Chaverra that the cocaine was not ready. Mr. Chaverra then arrived; he and Mrs. Chaverra had a conversation. Mrs. Chaverra soon broke down in tears and explained that Alvaro had not yet delivered "it." Mr. Chaverra was not satisfied with his wife's response and called Alvaro on the phone, telling Mrs. Chaverra that Alvaro "has to obey." Alvaro soon arrived, carrying a paper bag containing one ounce of cocaine, which was given to Mrs. Altamirano. She then returned to Agent Rodriguez and delivered the drugs. Agent Rodriguez made a third one-ounce purchase on June 11. This time the transaction proceeded without incident. Mrs. Altamirano told her undercover customer that Mrs. Chaverra was her supplier and that the Chaverra house contained a stash of cocaine and large amounts of cash. With regard to this cocaine sale, Mrs. Altamirano testified that Alvaro delivered the cocaine, which Mrs. Chaverra then turned over to her housekeeper. Mr. Chaverra observed the transaction.

On June 21, 1986, Agent Rodriguez visited Mrs. Altamirano at her home. She indicated that she had just returned from Ecuador carrying one kilogram of cocaine. Agent Rodriguez testified that Mrs. Altamirano then explained how Maria de Soto's home at 5812 North California was used as a cocaine selling place, and that, at another apartment one-half block away, Ms. de Soto and some friends stored, packaged, and weighed cocaine. According to Agent Rodriguez, Mrs. Altamirano also told him that she would continue to deal with him directly because Ms. de Soto and Mrs. Chaverra did not want to deal with Agent Rodriguez.

The government offered as evidence numerous telephone pen register records from the telephone numbers of the Chaverras, Ms. de Soto, and Alvaro covering the period between April and October 1986. These records revealed numerous calls of short duration from the various residences to Florida and Colombia. For example, Ms. de Soto called numbers in Florida 300 times and numbers in Colombia 142 times during this period. One of her monthly phone bills totaled $1,596.

The investigation conducted by Agent Rodriguez did not bear immediate fruit because the investigation was not approved by his supervisors as a "Group 2 undercover operation" until January 1987. *See* Tr. IV at 68. Consequently, the relevant facts of this case next occur in mid-October 1986. On October 15, 1986, several officers from the Chicago Police Department–Drug Enforcement Administration Task Force (Task Force) were conducting a surveillance of Ms. de Soto's building at 5812 North Campbell because they had received an informer's tip that a cocaine delivery would soon be made to that address. That afternoon, they observed Mr. Chaverra drive up in front of the building in a gray Mercury Cougar, enter the building, and then exit ten minutes later. Agents attempted to follow him, but they eventually lost him in traffic.

At approximately 5:00 a.m. the following morning, the agents spotted a brown Mercury Marquis slowly circling the block. After three tours of the area, the car stopped in front of Ms. de Soto's building. Two persons got out of the car and went into the building; the agents could not tell which apartment they entered in the two-apartment building. Suspecting that this was the delivery vehicle, Chicago Police Lt. Maurice Dailey radioed for a canine narcotics team to inspect the car. A narcotics dog named Rex was walked by the car; its handler reported that Rex reacted positively to the presence of drugs in the rear of the Marquis.

About an hour later, 5812 North Campbell started bustling with activity. First, Sanchez was dropped off by a passing car and entered the building. Next, an Hispanic man arrived, walked up the stoop, and entered. About fifteen minutes later, an empty-handed Sanchez walked out of 5812 North Campbell and stopped on the stoop. He looked up and down the street and then walked to Alvaro's building—5752 North Campbell. Five to ten minutes later, Sanchez returned to 5812 North Campbell carrying a small paper bag. However, moments after entering the building, Sanchez again left. This time, he was accompanied by Ms. de Soto. The two looked up and

down the street, and then together walked to and entered 5752 North Campbell. Ten to fifteen minutes later, Sanchez and Ms. de Soto, now toting a gray flight bag, left 5752 North Campbell and returned to 5812 North Campbell. The Hispanic man who had earlier entered Ms. de Soto's building then left, carrying a brown paper bag.

At around 12:15 p.m., Ms. de Soto left her building with two children and a man. They all entered the brown Marquis to which Rex had earlier reacted positively. Members of the surveillance team stopped the car and arrested Ms. de Soto and the man. A later search of the car revealed a secret compartment hidden in the interior of the gas tank. Inside that compartment was discovered more than ten kilograms of 91 percent pure cocaine.

At around 12:30–12:45 p.m., Mr. Chaverra, accompanied by two other men, arrived at 5812 North Campbell. They were stopped by the police. Upon their indicating that they were entering Ms. de Soto's building, they were arrested.

Members of the Task Force secured Ms. de Soto's apartment at 5812 North Campbell and Alvaro's apartment at 5752 North Campbell. Subsequently, the officers executed searches of these premises pursuant to search warrants. These searches produced a variety of incriminating evidence, including, from Ms. de Soto's apartment, large amounts of cash and ledgers and journals listing names and information later interpreted as being drug related. A triple-beam scale, a revolver, a safe, and four kilograms of cocaine were recovered from Alvaro's apartment.

In October 1986, just before the arrests at Ms. de Soto's apartment, Agent Rodriguez re-established contact with Mrs. Altamirano, who still did not know his undercover status. After the arrest of Mr. Chaverra and Ms. de Soto, a number of conversations between Agent Rodriguez and Mrs. Altamirano were recorded. In those conversations, she described the organization of the distribution operation and stated that Mrs. Chaverra was still willing and able to sell cocaine despite the arrest

of her husband and her sister. No further undercover purchases ever occurred, however.

## II

## ANALYSIS

Each defendant raises a number of issues on appeal. We shall address each defendant's arguments separately.

### A. Mr. Chaverra's Appeal [2]

1. Admission of Testimony of Lt. Dailey

Mr. Chaverra submits that the district court abused its discretion in allowing Lt. Dailey to testify as an expert witness. Specifically, he contends that the district court erred in allowing Lt. Dailey to testify as to (1) his opinion on the manner in which drug dealers operate, including countersurveillance activities, (2) his opinion on the true nature of certain activities that he observed, and (3) his interpretation of certain documents seized at Ms. de Soto's apartment. *See* Mr. Chaverra's Br. with Counsel at 16–17.

We begin our evaluation of these contentions by stating the basic principles that must guide our inquiry:

■ 1. Federal Rule of Evidence 702, governing the admission of expert testimony in federal courts, states that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Courts have recognized that "[t]he subject matter of the expert testimony here, *i.e.*, the clandestine manner in which drugs are bought and sold, is unlikely to be within the knowledge of the average layman." *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983); *see also United States v. Young*, 745 F.2d 733, 760 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Borrone–Iglar*, 468 F.2d 419, 421 (2d Cir.1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). Therefore, law enforcement experts may testify in order to assist the jury in understanding particular transactions. However, like all expert testimony, this testimony must be evaluated under the qualification and helpfulness requirements of Rule 702. In short, each witness must be qualified as an expert and the district court must determine that the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see also United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir.1988) ("interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of ... Fed.R.Evid. 702"); *United States v. Devine*, 787 F.2d 1086, 1088 (7th Cir.) (affirmed district court's refusal to admit proffered testimony dealing with subject understandable by jury without help of expert), *cert. denied*, 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 107 (1986).[3]

■ 2. The admission of expert testimony, like all evidentiary determinations, constitutes a ground for reversal by a court of appeals "only where the district court commits a clear abuse of discretion." *United States v. Marshall*, 856 F.2d 896, 901 (7th Cir.1988); *see also United States v. Peco*, 784 F.2d 798, 800 (7th Cir.), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90

---

**2.** Mr. Chaverra wrote a pro se brief and a brief with counsel which raised different issues. A motions panel of this court allowed the separate briefs to be filed on Mr. Chaverra's behalf. *United States v. de Soto*, No. 87–2400 (7th Cir. July 14, 1988) (order).

**3.** Commentators have stated that: ·
 The helpfulness test subsumes a relevancy analysis. In making its determination, the

court must proceed on a case-by-case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently existing about the subject of the proposed testimony and (2) on the court's appraisal of the facts of the case.

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] at 702–18 (1988).

L.Ed.2d 723 (1986). However, the abuse of discretion standard of review does not mean the absence of any review at all. *See In re Ronco, Inc.*, 838 F.2d 212, 217 (7th Cir.1988) ("Review under an abuse of discretion standard does not mean no appellate review."). An appellate court always must be mindful of the context in which an evidentiary decision is made. When the litigation context presents circumstances particularly susceptible to abuse, we must be especially alert to the possibility of prejudice. Such a situation exists here. Lieutenant Dailey was called by the government to testify both as an eyewitness to the events of October 16 and as an expert on law enforcement and drug dealer methodology. Testifying as both eyewitness and expert is permissible. *See Young*, 745 F.2d at 760; *Carson*, 702 F.2d at 369. However, when these two roles are intertwined, the possibility of juror confusion is increased. Here, for instance, this intermingling of the two roles increased the possibility that the jurors would not distinguish between Lt. Dailey's role as eyewitness and his role as expert. This situation placed an especially heavy burden on the district court to ensure that the jury understood its function in evaluating the evidence. In reviewing the record, we must pay special attention to the manner in which the district court discharged this responsibility. We now turn to the precise situations presented for our review.

### a. countersurveillance testimony

■ Lieutenant Dailey testified as an expert with respect to "countersurveillance" techniques employed by drug dealers to avoid detection by competitors or the police. As an example of such a technique, the Lieutenant noted that when "on the street when they are on foot they constantly stop and look back and forth at the street traffic to see if anyone is watching them." Tr. II at 123. Later on in his testimony, while describing the events of October 16, Lt. Dailey recounted how he twice witnessed Sanchez emerge from Ms. de Soto's building (once accompanied by Ms. de Soto) and look up and down the street while standing on the stoop. When

asked by the prosecutor to describe Sanchez' activity more precisely, Lt. Dailey stated that Sanchez "was looking for either us, the police, or any type agents or, again, competitors that may be concerned what his activities were." *Id.* at 137. Sanchez' actions "definitely" constituted countersurveillance, in Lt. Dailey's opinion. *Id.; see also id.* at 140. Mr. Chaverra now submits that Lt. Dailey's interpretation of these outwardly commonplace and innocuous actions—looking up and down a street—was based on mere speculation and improperly imposed the imprimatur of expert testimony on an otherwise straightforward narrative. Mr. Chaverra's Br. with Counsel at 20–21. Therefore, the defendant further argues, Lt. Dailey's testimony should have been excluded as intruding on the exclusive province of the jury. Under the circumstances set forth in this record, we cannot agree.

As we have noted earlier, testimony by law enforcement officers regarding drug countersurveillance may be admitted as expert testimony. For example, in *United States v. Stewart*, 770 F.2d 825, 831 (9th Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 888, 88 L.Ed.2d 922 (1986), the Ninth Circuit "upheld admission of DEA agents' opinion testimony that the defendant's activities were similar to the *modus operandi* of persons conducting counter-surveillance while transporting drugs." *See also United States v. Maher*, 645 F.2d 780, 783–84 (9th Cir.1981) (testimony regarding *modus operandi*). The particular conduct as to which the agents testified in *Stewart* and *Maher* was the manner in which the defendants drove their cars—circuitously touring the drop-off point several times before stopping. Such activity, especially in city streets with congested parking spaces, may appear, to the outside observer, to be perfectly normal and innocent—just like looking up and down a street. As the Ninth Circuit concluded, however, the everyday appearance of the activity is not an automatic bar to the admission of expert testimony which may attribute a more sinister motive to the actions. *See also United States v. Patterson*, 819 F.2d 1495, 1507

(9th Cir.1987) (testimony of heroin street distribution; some individuals acted as lookouts for police or customers, others collected payments, while others collected cash); *Carson,* 702 F.2d at 369 (testimony of street-corner sales as being drug transactions); *Borrone–Iglar,* 468 F.2d at 421 (testimony of code words in conversation as actually representing drug orders).

However, because such activities are usually innocent, the district court must be especially vigilant in ensuring that a law enforcement expert's testimony does not unfairly prejudice the defendant or usurp the jury's function. Consequently, there are limits to admission of this type of testimony: the expert must not base his opinion on mere speculation; nor can he speak, as an expert, to matters that the jury can evaluate for itself. *See United States v. Arenal,* 768 F.2d 263, 269 (8th Cir.1985) (law enforcement expert "testimony is still subject to exclusion if the subject matter is within the knowledge or experience of the jury, because the testimony does not meet the helpfulness requirement of Rule 702"); *Young,* 745 F.2d at 760 (court questioned need to have expert police testimony that "25 to 30 people milling around outside a building" indicated presence of heroin den).

Our review of the record convinces us that, in this case, the district court was well aware of its special responsibilities and proceeded with the utmost caution. Immediately before Lt. Dailey testified, the district court carefully considered the defendants' arguments to exclude this expert testimony. Tr. II at 5–10. It stated that:

> What we're dealing with here, as I understand it, is the projected testimony of someone who has observed a lot of narcotics transactions, and has observed conduct that might, to someone who has not had that as part of his or her common experience, appear either perfectly innocuous or perhaps with argument might view that with some degree of suspicion.

*Id.* at 8. After that characterization of Lt. Dailey's proposed testimony, the court allowed admission of the evidence. However, later on, during the testimony of Lt.

Dailey, the district court admonished the jury "that the fact that an expert has given an opinion does not mean that it[']s binding on you. . . . You should assess the weight that's to be accorded to this expert opinion in the light of all of the evidence in the case." *Id.* at 164. This instruction was repeated to the jury at the conclusion of the trial. Tr. IX at 165. Finally, and most importantly, the jury had an opportunity to hear the defendants' arguments, which cast all these activities in an innocent light. *Id.* at 108–112; *see also id.* at 108 ("[A]n American jury needs something more than a policeman saying looking up and down a street is countersurveillance and he was engaged in countersurveillance and that's it."). On this record, we cannot say that the district court abused its discretion in admitting Lt. Dailey's testimony regarding countersurveillance.

### b. *"dope deals" testimony*

■ The district court's concern that the jury appreciate its role in evaluating Lt. Dailey's testimony is further illustrated by its decision to strike his opinion that two of the defendants were conducting "dope deals" in Ms. de Soto's building. Tr. II at 150. In the course of his narrative, Lt. Dailey had testified that he saw Ms. de Soto and Sanchez enter Ms. de Soto's building carrying a gray flight bag, and, shortly afterwards, an Hispanic man, who previously had entered the building empty-handed, emerged carrying a paper bag. Lieutenant Dailey did not see whether the Hispanic man had entered Ms. de Soto's apartment. When asked to describe the nature of the activities inside the building, Lt. Dailey testified that they were "dope deals or drug sales, purchases." *Id.* The district court struck the answer. Even though the answer was stricken and the jury was cautioned to disregard the statement, *id.* at 149–50, Mr. Chaverra now submits that the comment nevertheless constituted reversible error. *See* Mr. Chaverra's Br. with Counsel at 18. The government responds that the district court erred in striking the statement. *See* Government Br. at 26. Relying on *Young,* 745 F.2d at 760 (court affirmed admission of eye-

witness police officer's opinion that certain activities constituted drug sales), and *Carson,* 702 F.2d at 369–70 (court affirmed admission of eyewitness agent's opinion that street-corner deals "appeared to him to be drug transactions"), the government suggests that the district court was overly cautious and that Lt. Dailey should have been permitted to testify that he regarded the pattern of activity he witnessed to be a "dope deal." *See generally* Fed.R.Evid. 704 (opinion testimony on ultimate issue permitted).

There does appear to be authority for the government's position—at least in the abstract. However, a district court must be given great latitude in any evidentiary judgment call and, in a context as delicate as the one before us, we should certainly be most circumspect about second-guessing a district court's determination to proceed cautiously. Here, where Lt. Dailey was unable to see the activities within Ms. de Soto's apartment, the court's conservative approach is certainly understandable and we certainly shall not express disapproval of its judgment. Nor shall we presume that the jury ignored the court's explicit cautionary instruction. In making this determination, we note that, like the district court's decision regarding the proper scope of Lt. Dailey's countersurveillance testimony, this evidentiary decision was informed and careful. Prior to the government's embarking on this line of questioning, the court held a prolonged sidebar discussion, *see* Tr. II at 142–49; when the government persisted in pursuing this improper evidence, apparently through a misunderstanding, the court made its evidentiary ruling and then called another conference, outside the hearing of the jury, to explain its decision and stress that Lt. Dailey's testimony must be restricted to matters within his past experience. *Id.* at 151–59. It is clear that no reversible error was committed.

### c. testimony regarding documents retrieved from Ms. de Soto's apartment

■ As a final evidentiary challenge, Mr. Chaverra also submits that Lt. Dailey's testimony interpreting documents seized at Ms. de Soto's apartment constituted plain error.[4] *See* Mr. Chaverra's Br. with Counsel at 19; *see also id.* at A–2 *et seq.* (copies of the seized records). These documents appear to be informal business records: all but one contain numbers and most also contain names and comments cryptically entered, in Spanish, in the margins. Names including "Gustavo," "Ruth," and "Mona" appear on some of the documents. For example, on the most formal ledger-type sheet, there is an entry for "Gustavo's rent" and a corresponding figure. *See* Mr. Chaverra's Br. with Counsel at A–8. Mr. Chaverra now challenges Lt. Dailey's tying the records to drug sales, despite no mention of the words drugs, cocaine, heroin, or similar terminology in the records, and his explanation of numbers listed on certain documents as representing records of drug sales in quantities of kilograms or ounces. When testifying, Lt. Dailey stated that drug dealers often drop the zeros in thousand-dollar calculations, and he referred to various numerals as representing kilograms or ounces of cocaine. Tr. VII at 126–32. He also stated that he did not know who authored these documents.

The admission of this testimony was not plain error. The seized records were quite obscure and Lt. Dailey's expert interpretation could be considered helpful to the jury. *See* Fed.R.Evid. 702. Additionally, we note that the witness himself never linked these documents to the defendants on trial; the government argued that connection during its closing statement. Furthermore, Lt. Dailey's interpretation received some corroboration: Government Exhibit 16T features a notation for a $345 expense for the repair of a brown car; also found in the search of Ms. de Soto's apartment was a $345 car repair receipt for repairs made on

---

**4.** The plain error standard of Federal Rule of Criminal Procedure 52(b) applies because Mr. Chaverra (or any other defendant) did not object during trial to Lt. Dailey's discussion of certain documents as the business records of "people associated with this group." Tr. VII at 118.

the Mercury Marquis—a brown car. *See* Tr. III at 75; Mr. Chaverra's Br. with Counsel at A–5. Accordingly, we refuse to hold that the admission of Lt. Dailey's testimony interpreting these seized documents constituted plain error.

### 2. Reading of Transcript

■ Mr. Chaverra next submits that the district court committed plain error in re-reading part of the trial transcript to the jury. During closing argument, Mr. Chaverra's trial counsel asserted that *Ruth* Chaverra, not *Gustavo* Chaverra, had said that Alvaro "must obey" and deliver the cocaine for the June 3 sale to Agent Rodriguez. Despite the government's objection, Mr. Chaverra's attorney persisted in this recollection of Mrs. Altamirano's testimony. The government again objected, stating that the correct testimony demonstrated that Mr. Chaverra, not Mrs. Chaverra, had made this key comment that revealed him as being a leader of the conspiracy. Tr. IX at 51. To clear up the problem, the court read two pages of Mrs. Altamirano's testimony to the jury. Tr. IX at 93–94. This testimony clearly supported the government's characterization.

Mr. Chaverra now submits that the re-reading of the testimony was too broad in scope because it reiterated the government's case in a prejudicial manner and therefore constituted an abuse of the district court's discretion. *See* Mr. Chaverra's Br. with Counsel at 22. We cannot agree. Not only did Mr. Chaverra's trial counsel fail to object to the scope, but, prior to the re-reading, he specifically invited the district court "to clarify [the confusion] with the jury" caused by the government's objections during the closing argument. Tr. IX at 92. Under these circumstances, Mr. Chaverra cannot now complain that the scope of the re-reading constituted plain error. *See* Fed.R.Crim.P. 52(b). The repeated testimony was (1) not overly broad, (2) relevant to establishing Mr. Chaverra's role in the conspiracy, (3) necessary to correct a misstatement made during closing argument, and (4) accompanied (both before *and* after the reading of the transcript) by cautionary instructions that the

evidence not be accorded any special weight and that the re-reading should not impair defense counsel's credibility. *See* Tr. IX at 92–93 & 95–96. Thus, the district court did not abuse its discretion in re-reading a portion of the testimony to the jury. *See United States v. Keskey,* 863 F.2d 474, 476 (7th Cir.1988) (district court's decision "whether to read back testimony to the jury is a matter purely within the court's discretion").

### 3. Unconstitutional Isolation Order

■ Mr. Chaverra next maintains that the district court's pre-trial isolation order deprived him of his constitutional rights to: (1) due process under the fifth amendment; (2) counsel under the sixth amendment; and (3) protection from cruel and unusual punishment under the eighth amendment. Mr. Chaverra's Pro Se Br. at 1. After Mr. Chaverra was arrested, the grand jury indicted him for threatening and planning to kill Mrs. Altamirano and her children, as well as the prosecuting Assistant United States Attorney. *See generally United States v. Chaverra Cardona,* 879 F.2d 1551 (7th Cir.1989) (affirming Mr. Chaverra's conviction on these offenses). On the basis of this indictment, the government moved to isolate Mr. Chaverra from other prisoners and restrict his contact only to his counsel. The district court granted the motion and ordered that:

> Enter order restricting conditions of detention. Accordingly, defendant shall not be permitted to place or receive any telephone calls with the exception of placing a phone call to any of his counsel, and then under the procedure outlined in the attached draft order; defendant shall be isolated from any conversation and any contact of any kind with any other inmate at the MCC, defendant shall not be permitted any visitors, with the exception of his unaccompanied attorneys of record.

Gustavo Chaverra Cardona R.88.

In light of the witness-threatening indictment against Mr. Chaverra and his unrestricted access to his attorneys, *see id.,* Mr. Chaverra's argument that the isolation or-

der deprived him of constitutional rights is meritless.

#### 4. Sufficiency of the Evidence to Convict Mr. Chaverra

Mr. Chaverra submits that there was insufficient evidence to convict him of conspiracy to traffic in drugs and possession of cocaine with intent to distribute. *See* 21 U.S.C. §§ 846, 841(a)(1).[5]

##### a. standard of review

■ Prior to examining Mr. Chaverra's sufficiency challenge, we note that he bears a heavy burden. On review by this court, the "test is whether, after viewing the evidence in the light most favorable to the government, *'any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). In undertaking this review of the sufficiency of a conspiracy conviction, we also consider circumstantial and direct evidence, as well as " 'all the reasonable inferences that can be drawn from the evidence,' " in the government's favor. *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *Pritchard*, 745 F.2d at 1122), *cert. denied,* — U.S. —, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989)); *see also United States v. Williams*, 858 F.2d 1218, 1221 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). This standard has been applied in numerous cases evaluating the sufficiency of drug conspiracy convictions. *See, e.g., Nesbitt, supra; United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983).

##### b. conspiracy

■ In *United States v. Moya–Gomez*, 860 F.2d 706 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989), this court had occasion to deal with the definition of criminal conspiracy. We stated that:

"A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). A formal agreement need not be demonstrated although agreement is the primary element of a conspiracy. *Id.*

*Moya–Gomez*, 860 F.2d at 758. Therefore, the essential elements of the conspiracy statute under which Mr. Chaverra was convicted " 'are the existence of and agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substances Act.' " *Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982)); *see also* 18 U.S.C. § 846. Here, we have reviewed the evidence introduced at trial and are convinced that the government more than satisfactorily established the existence of a conspiracy to distribute cocaine. The testimony of Mrs. Altamirano, Lt. Dailey, and Agent Rodriguez, together with the seized records, drug paraphernalia, cash, and substantial quantity of cocaine, all support the jury's determination that a conspiracy existed.

The government must also establish the participation of the individual under indictment in the conspiracy. "[T]he government must prove that the alleged coconspirator knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *Moya–Gomez*, 860 F.2d at 758; *see also United States v. Diaz*, 876 F.2d 1344, 1351 (7th Cir.1989); *United States v. Griffin*, 827 F.2d 1108, 1117 (7th Cir.1987) ("Under a combination §§ 841(a)(1), 846 prosecution, the Government must prove that [the] de-

---

**5.** Mr. Chaverra makes this argument in both Part I of his brief with counsel and Part III of his pro se brief.

fendant ... knew of the conspiracy to distribute drugs and that he intended to join and associate himself with its criminal design and purpose."), *cert. denied*, —— U.S. ——, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988); *United States v. Beniach*, 825 F.2d 1207, 1211 (7th Cir.1987); *United States v. Abayomi*, 820 F.2d 902, 905 (7th Cir.), *cert. denied*, 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987); *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985); *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985); *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984). We also note that even a slight connection between the defendant and the conspiracy may support a conviction, *see, e.g., Moya–Gomez*, 860 F.2d at 758; *United States v. Alvarez*, 833 F.2d 724, 730 (7th Cir.1987); indeed, even a " ' "single act may be foundation for drawing the actor within the ambit of a conspiracy.... But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may *reasonably infer* from it such an intent." ' " *Moya–Gomez*, 860 F.2d at 758 (quoting *United States v. Quintana*, 508 F.2d 867, 881 (7th Cir.1975) (quoting *United States v. Varelli*, 407 F.2d 735, 743 (7th Cir.1969), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972))) (emphasis supplied by *Moya–Gomez* ).

We have reviewed the evidence supporting Mr. Chaverra's conviction for conspiracy, and we find it more than adequate. Specifically, the jury heard extensive testimony from Mrs. Altamirano, who explained Mr. Chaverra's role not only as a mere member of the conspiracy, but rather, as a leader of the cocaine ring. As corroboration of her testimony, the jury heard a reading of a transcript of a recorded conversation between Agent Rodriguez and Mrs. Altamirano in which she stated that "Don Gustavo" was "the leader of all those people." Tr. IV at 103. Additionally, the jury was entitled to conclude that the "Gustavo" referred to in the drug records seized at Ms. de Soto's apartment was the defendant—Gustavo Chaverra Cardona. The case against Mr. Chaverra was substantially more than one of his "mere association

with, knowledge of, approval of, or presence at a conspiracy," *Moya–Gomez*, 860 F.2d at 759; he clearly played a major role in its operation. Accordingly, we hold that the government provided sufficient evidence to prove that the defendant was a member of a conspiracy to distribute cocaine.

### c. possession

■ Mr. Chaverra next submits that this court should reverse his conviction for Count II—possession with intent to distribute the ten kilograms of cocaine stashed in the Marquis. His argument is twofold. First, he initially argues that he never had actual or constructive possession of the cocaine. Mr. Chaverra's Br. with Counsel at 13. This argument is meritless. Mr. Chaverra's liability for this offense stems not from actual or constructive possession of the cocaine, but rather, from his coconspirator's—Ms. de Soto's—liability for this offense. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Second, and in recognition of this latter point, Mr. Chaverra later submits that the government failed to establish that the Marquis cocaine delivery was in furtherance of the conspiracy and thus he ought not have been convicted on Count II through *Pinkerton* liability. Mr. Chaverra's Br. with Counsel at 15. We disagree.

*Pinkerton* has been repeatedly interpreted by this court "to mean that each conspirator may be 'liable for overt acts of every other conspirator done in furtherance of the conspiracy.' " *United States v. Gironda*, 758 F.2d 1201, 1211 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985) (quoting *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981)); *see also United States v. Redwine*, 715 F.2d 315, 322 (7th Cir.1983) ("it is settled that a proven conspirator is responsible for the substantive offenses based on the overt acts of his fellow conspirators as long as those acts were done in furtherance or as a natural consequence of the conspiracy"), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). As noted above, Mr.

Chaverra's conviction for membership in the cocaine conspiracy is more than adequately supported by the record; we have also reviewed the evidence supporting Ms. de Soto's conspiracy conviction, and find it overwhelming. Having made these determinations, we now turn to whether Ms. de Soto's possession of the cocaine in the Marquis was "in furtherance of" the conspiracy, and thus constitutes a ground for Mr. Chaverra's liability.

The record supports the conclusion that Ms. de Soto's possession of ten kilograms of cocaine, here hidden inside a secret automobile compartment, was clearly within the overall scheme and goals of the conspiracy to distribute drugs, and therefore, Mr. Chaverra "is vicariously liable for the overt acts committed by the other conspirators." *United States v. Shelton*, 669 F.2d 446, 454 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Ms. de Soto's possession of the ten kilograms of cocaine could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement," so that there was sufficient evidence on which the jury could convict Mr. Chaverra. *Pinkerton*, 328 U.S. at 648, 66 S.Ct. at 1184. "The act done was in execution of the enterprise ... [and] we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." *Id.* at 647, 66 S.Ct. at 1184.

We have found no reversible error.[6] Consequently, we affirm Gustavo Chaverra Cardona's conviction in Appeal No. 87–2401.

*B. Mrs. Chaverra's Appeal*

 Like her husband, Mrs. Chaverra appeals her conviction on all counts. Her most fundamental concern is her conviction for conspiracy. She submits that the government presented insufficient evidence to find her guilty; the principal contention

is that Mrs. Altamirano's testimony did not offer credible proof of Mrs. Chaverra's role in the conspiracy. As we have already noted, *supra* Part I, Mrs. Altamirano testified that Mrs. Chaverra provided her with cocaine for sale to Agent Rodriguez, participated with Ms. de Soto and Mr. Chaverra in the selling of cocaine, and, among other things, promised to continue selling cocaine even after the arrests of Mr. Chaverra and Ms. de Soto. Mrs. Chaverra now argues that Mrs. Altamirano's testimony was clearly unreliable. In support of this proposition, she refers to (1) Mrs. Altamirano's status as a cooperating government witness who had been independently indicted, (2) Mrs. Altamirano's history of defrauding both Mrs. Chaverra and Ms. de Soto by claiming to speak with a non-existent fortune teller named Yolanda, and (3) Mrs. Altamirano's own history of drug dealing. Mrs. Chaverra additionally points to the lack of any drugs found during the search of her home and her having never been observed at Ms. de Soto's apartment. Mrs. Chaverra's Br. at 3–4.

As discussed above, in evaluating a sufficiency of the evidence challenge, we look to see "whether, after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). Additionally, when such a challenge focuses on the believability of oral testimony, "we defer to the jury's determination of witnesses' credibility." *United States v. Vega*, 860 F.2d 779, 794 (7th Cir.1988). "An appellate court will not weigh the evidence or assess the credibility of the witnesses." *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986). Indeed, " 'the credibility of witnesses is peculiarly within

---

**6.** In his pro se brief, Mr. Chaverra also submits that the district court's failure to sever his trial from that of his codefendants constituted reversible error. We have reviewed Mr. Chaverra's argument and it is meritless. *See, e.g.,*

*United States v. Holland*, 831 F.2d 717, 721–22 (7th Cir.1987); *United States v. Peters*, 791 F.2d 1270, 1301–03 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986).

the province of the jury and our review is prohibited absent extraordinary circumstances.'" *Vega*, 860 F.2d at 794 (quoting *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985)). Such extraordinary circumstances are not present here. The jury heard about Mrs. Altamirano's cooperation agreement, as well as her own drug dealing and the "Yolanda" story, yet decided to credit her testimony as true. We refuse to upset the jury's determination.

In so ruling, we note that to prove participation in a conspiracy, "the government must show more than that the defendant was arrested in '"a climate of activity that reeks of something foul."'" *Moya–Gomez*, 860 F.2d at 759 (quoting *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir.1985) (quoting a series of cases cited at 776 F.2d at 549 n. 9)). The government must prove that the defendant took some step beyond "mere association with, knowledge of, approval of, or presence at a conspiracy." *Moya–Gomez*, 860 F.2d at 759. Courts must be especially watchful to uphold this principle and guard against guilt by familial association when a conspiracy is alleged to be composed of family members such as husband and wife or sister and sister. The district court in this case demonstrated such care in instructing the jury during voir dire, *see* Tr. II at 44–45, and again upon submission of the case to the jury, *see* Tr. IX at 169. After thoroughly reviewing the record, we are convinced that the evidence properly supported the jury's conspiracy conviction of Mrs. Chaverra. Under the *Pinkerton* rule of coconspirator liability, *see supra* Part II.A.4., Mrs. Chaverra is thus also liable for the other crimes committed by her coconspirators in furtherance of the conspiracy. Accordingly, we affirm the conviction of Ruth Urrego Chaverra in Appeal No. 88–2702.

## C. Ms. de Soto's Appeal

In her appeal, Ms. de Soto makes three related arguments questioning whether the district court properly denied her motions to (1) quash her arrest for lack of probable cause and (2) suppress the evidence found in the search of her apartment because the entry was warrantless and the evidence recovered was beyond the scope of the warrant. *See* Maria Urrego de Soto R.67; 69; *see also* Ms. de Soto's Br. at 1. We shall review each challenge separately.

### 1. Ms. de Soto's Arrest

Ms. de Soto submits that her arrest should have been quashed for lack of probable cause. We shall not overturn a district court's underlying factual findings made in a probable cause hearing "unless they are clearly erroneous, as the trial judge has had an opportunity to assess the credibility of the witnesses at the evidentiary hearing." *United States v. Goudy*, 792 F.2d 664, 668 (7th Cir.1986); *see also United States v. Lima*, 819 F.2d 687, 688 (7th Cir.1987); *United States v. Covelli*, 738 F.2d 847, 853 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984). Review of the ultimate probable cause determination, however, is *de novo*, and conducted in light of the following standard:

> The police have probable cause to arrest an individual where "the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."

*Covelli*, 738 F.2d at 853 (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)); *see also Lima*, 819 F.2d at 688. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). We have reviewed the record of the evidentiary hearing and find Ms. de Soto's claim meritless.

Two police officers testified that they had received a tip from a reliable confidential informer that "a person who lives at that location under the name of Maria Soto was going to get a large shipment of narcotics" by automobile. Tr. of Feb. 20, 1987 at 10 [hereinafter Suppression Tr.]; *see*

*also id.* at 57. Additionally, during the stakeout of Ms. de Soto's building, these officers noticed a number of suspicious comings-and-goings from Ms. de Soto's building, which, in their experience, led them to believe that drug deals were taking place. Finally, when the Marquis arrived in front of 5812 North Campbell, Rex the narcotics-sniffing dog reacted positively to the presence of drugs in the rear of the car. Viewing this evidence in the light of "the factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians act," *United States v. Watson,* 587 F.2d 365, 368 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979), we cannot say that the district court erred. *See also Lima,* 819 F.2d at 688; *Covelli,* 738 F.2d at 853. When objectively examining the totality of the evidence, probable cause existed for the arrest of Ms. de Soto when she attempted to drive away in the Marquis. *See Lima,* 819 F.2d at 688; *cf. United States v. Spetz,* 721 F.2d 1457, 1464 (9th Cir.1983) ("validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant only if sufficient reliability is established in the application for the warrant").

### 2. Search of Ms. de Soto's Apartment

#### a. *warrantless entry*

■ As discussed above, *supra* Part I, the police approached Ms. de Soto's apartment after her arrest and sought entry. Agent Tom Bridges knocked on the apartment door; when Sanchez opened it, Agent Bridges identified himself as a police officer; Sanchez then attempted to slam the door in his face. Agent Bridges and other agents entered the apartment and arrested Sanchez; another person who was in the apartment escaped by jumping out of a window. Suppression Tr. at 76–78. The agents then secured the apartment and remained inside until a search warrant was obtained more than eight hours later.

"The fourth amendment safeguards an individual's right to be free from warrantless intrusions into his home." *United States v. Talkington,* 843 F.2d 1041, 1044

(7th Cir.1988). A warrantless entry, therefore, is presumptively unreasonable and may be justified only if it falls within one of the "few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnote omitted). One such exception is the "exigent circumstances" doctrine. Exigent circumstances exist when there is " 'a compelling need for official action and no time to secure a warrant.' " *United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978)), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987); *see also Talkington,* 843 F.2d at 1044. We determine whether a warrantless entry was justified by exigent circumstances by examining objectively " 'the reasonableness of law enforcement officials' belief that exigent circumstances have arisen.' " *United States v. Patino,* 830 F.2d 1413, 1415 (7th Cir.1987) (quoting *United States v. Dowell,* 724 F.2d 599, 602 (7th Cir.), *cert. denied,* 466 U.S. 906, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984)), *cert. denied,* —— U.S. ——, 109 S.Ct. 2072, 104 L.Ed.2d 637 (1989). In other words, we ask whether "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Rivera,* 825 F.2d at 156 (citing *United States v. Miller,* 800 F.2d 129, 133 (7th Cir.1986)); *see also Talkington,* 843 F.2d at 1044. Here, we agree with the district court that the police had probable cause to believe that Sanchez and others in the apartment would attempt to destroy evidence. The initial entry by Agent Bridges and his colleagues to secure the premises, following Sanchez' reaction to Agent Bridges' arrival at the door, was a valid warrantless entry of the premises. Therefore, the entry was not unconstitutional.

#### b. *search*

■ The subsequent search was made pursuant to a warrant. Ms. de Soto first argues that the evidence obtained by the search should be suppressed because of the

eight-hour lapse between the securing of the premises and the grant of the warrant. *See* Ms. de Soto's Br. at 10. The government offers no explanation for either the delay or for the agents' need to *remain inside* the secured premises while a warrant was being obtained. However, our disposition of this matter does not require that we focus on the period between the warrantless entry and the procurement of the warrant. Our focus must be on one key point: the search was carried out pursuant to a validly issued warrant. The affidavit supporting the issuance does not rely on any evidence *obtained or seen* during the course of the warrantless entry and the eight-hour securing of the apartment. *See Murray v. United States,* —— U.S. ——, 108 S.Ct. 2529, 2535–36, 101 L.Ed.2d 472 (1988) (when warrant justifying search was issued pursuant to independent information, initial unlawful entry does not require suppression of evidence).

█ Ms. de Soto's final submission challenges the introduction of over $20,000 in cash seized at her apartment on the ground that "cash" was not specified in the warrant. *See* Maria Urrego de Soto R.40 at Ex. A (copy of warrant). We need not determine whether the cash is encompassed within the description in the warrant of the items to be seized. It is clear that, at the time the officers came upon the cash, they lawfully were searching for items described in the warrant. The cash was in plain view and the officers reasonably concluded that it was a fruit of the crime. *See* Tr. of Apr. 8, 1987 at 23 (When asked whether he remembered if "the safe was open at the time 5812 North Campbell was searched," Agent Bridges responded, "Yes."); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971) (plurality opinion); *United States v. Altman,* 797 F.2d 514, 515–16 (7th Cir.1986); *United States v. Paul,* 808 F.2d 645, 648 (7th Cir.1988).

### CONCLUSION

For the preceding reasons, we affirm the convictions of Gustavo Cardona Chaverra, Ruth Urrego Chaverra, and Maria Urrego de Soto.

Affirmed.