**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Adolfo NAVARRETE, Defendant–**
**Appellant.**

**No. 97–1583.**

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 5, 1997.

Decided Sept. 15, 1997.

Deborah A. Devaney, David Bindi (argued), Alex Menchaca, Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

Gerald J. Collins (argued), Chicago, IL, for Defendant–Appellant.

Before EASTERBROOK, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After being indicted on one count of conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, defendant, Adolfo Navarrete, waived his right to a jury trial. Following a one day bench trial, the district court found Navarrete guilty. The district court sentenced him to 33 months' imprisonment and upon release from custody, the court ordered him to report to the Immigration and Naturalization Service for appropriate deportation proceedings. Navarrete challenges the sufficiency of the evidence of his conspiracy conviction. For the following reasons, the district court's judgment is affirmed.

At Navarrete's bench trial, various United States Customs officials testified to the events surrounding Navarrete's arrest. On July 29, 1996, Navarrete arrived at O'Hare International Airport from Mexico City and was stopped by customs officials, who were suspicious because Navarrete did not have any baggage. The customs agents took Navarrete to a secondary area, where they search baggage as well as people. United States Customs employee, Michael Wells, and another agent questioned Navarrete about his declaration card, which Navarrete handed to them along with his Illinois driver's license and alien registration. After examining these items and questioning Navarrete, Wells obtained authorization from his supervisor to conduct a pat-down search of Navarrete.

Wells searched Navarrete pursuant to standard operating procedures and felt a hard object near Navarrete's groin. Wells' supervisor then gave authorization for a partial strip search, which revealed a package wrapped in black electrical tape in Navarrete's spandex shorts. Wells asked Navarrete to pull out the package. After Wells examined the package, he opened it and found a black, tar-like substance which tested as heroin. Later, the parties stipulated that the substance was 225.6 grams, nearly half of a pound, of 44% pure Mexican black-tar heroin.

United States Customs Special Agent, Carol Czech, took a statement from Navarrete translated from Spanish by an inspector with the United States Customs Service. The inspector testified that he read Navarrete his rights and that Navarrete signed the waiver in his presence. In his statement, Navarrete described that he had been contacted by his friend Julian, whose last name he did not know. Julian told Navarrete that his grandmother was very sick and that he should visit her in Acapulco, Mexico. After Navarrete flew from Chicago to Mexico City,

Julian asked him to smuggle drugs into the United States telling him he would be paid $2,000 via "Alfredo," whose telephone number was found on a scrap piece of paper in Navarrete's wallet.

After he made his statement, Navarrete agreed to cooperate with Agent Czech and telephoned Alfredo. He then met with Alfredo at the Jewel parking lot on Ashland Avenue in Chicago. Alfredo arrived in a car and Navarrete got in the front passenger side. They started to drive off and shortly thereafter customs officials arrested them. The parties stipulated that after the arrest, the government seized $700 dollars from Alfredo, in addition to $230 in his wallet. Agent Czech also testified that Navarrete had purchased his airline ticket to Mexico from a travel agency in Chicago. According to Navarrete's itinerary, he departed from Chicago O'Hare, arriving in Mexico City on the same day, July 27, 1996. He returned to Chicago two days later via Acapulco and Mexico City.

The day after his arrest, Navarrete cooperated with the United States Attorney's Office and gave a statement that the night before he left Mexico for Chicago, Julian had given him alcohol, cocaine, and provided a prostitute.

Fully counseled, Navarrete prepared a statement which was read before the grand jury. Navarrete's grand jury statement was also read into the record at the bench trial. He testified that a friend from his hometown in Mexico, Julian Soberanis, called him in Chicago recommending that he visit his grandmother before she died. Navarrete testified that Julian offered to repay a $300 debt and loan Navarrete the remainder of the money for the trip. Julian then directed him to contact Jose "Alfredo" Soberanis to purchase the round trip ticket from Chicago to Mexico City. Alfredo gave Navarrete the money and accompanied him to the travel agent. Navarrete then testified that he met Julian in Mexico and that Julian had asked him if he would deliver a package containing drugs to Alfredo in return for $2,000, instructing Navarrete how to conceal the package on his body. Navarrete agreed.

Navarrete testified that when he returned to Chicago, he was searched by customs inspectors, who found the package of heroin in his pants. He then agreed to arrange the delivery to Alfredo in the Jewel parking lot. When they met, Alfredo told Navarrete that he would be paid $700 at that time and that the rest of the money was at Alfredo's home. Navarrete placed the heroin next to the stick shift of the car. Alfredo started to drive away when customs agents stopped them.

Navarrete testified on his own behalf at his bench trial. He stated that he had gotten a call from Julian to take a trip to see his grandmother. He testified that he did not have a lot of money and that Julian would buy his airline ticket due to a $300 debt and that the remainder would be a loan. Navarrete then explained that Alfredo, Julian's cousin, was going to give him the money for the ticket. He booked his ticket to Mexico City. When he arrived in Mexico, he took a bus to Acapulco to visit his grandmother.

After visiting his grandmother, Julian and Navarrete went to a night club in Acapulco where Navarrete drank alcohol, did cocaine, and picked up a prostitute. Navarrete then testified that they were going to the Acapulco airport in a taxi when Julian told the prostitute to put the package of what Navarrete thought was cocaine in his pants. Navarrete stated he was drunk and did not resist. He also testified that he had looked for a place to discard the drugs while in both the Mexico City and O'Hare airports. While at O'Hare Navarrete stated that he did not know where he was and was hung over. He stated that he did not intentionally travel to Mexico for the purpose of bringing back heroin and that he did not know what kind of drug he had carried.

The district court addressed the question of whether there was a conspiracy, concluding that the recovered heroin proved the existence of a conspiracy to import heroin into the United States. The court also noted that Navarrete was disputing whether or not he was intentionally part of the conspiracy, not the operative facts of the case. Consequently, the district court concluded that Navarrete knew he was being asked to smuggle drugs and, thus, knowingly became a member of the conspiracy by agreeing to bring

the drugs over international borders into the United States. The district court discounted Navarrete's argument that he was drunk and confused concluding that there was not enough evidence in the record to support Navarrete's defense of diminished capacity. The court relied on other factors showing that Navarrete intentionally participated in the conspiracy, including Alfredo's willingness to meet Navarrete in the Jewel parking lot with $700 and Navarrete's testimony that he could not rid himself of the drugs in either the Mexico City or Chicago airports.

In addition, the district court found little disparity in the testimony of the government and the defense but, to the extent there were any differences, the court credited the testimony of the government witnesses. Last, the court noted that it did not matter whether Navarrete thought he was carrying cocaine as opposed to heroin, but that it was sufficient that Navarrete knew he was being requested to bring controlled substances into the United States.

■ On appeal, Navarrete asserts that he did not intentionally and knowingly agree to join the conspiracy. A conspiracy is "a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir.1996) (citation omitted). In order for the government to prove a conspiracy, substantial evidence must be provided that the conspiracy existed and that the defendant knowingly agreed to join the conspiracy. *Id.* at 166. The government may establish these elements through circumstantial evidence and the reasonable inferences therein concerning the parties' relationships, their overt acts, and their overall conduct. *United States v. Mojica*, 984 F.2d 1426, 1432 (7th Cir.1993). Although mere presence is insufficient to show that the defendant was acting in furtherance of a conspiracy, the government can prove that a defendant joined a conspiracy if his "presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy" is shown. *See United States v. Johnson–Dix*, 54 F.3d 1295, 1302 (7th Cir.1995) (citing *United*

*States v. Theodosopoulos*, 48 F.3d 1438, 1450 (7th Cir.1995)).

■ Because Navarrete concedes that there was a conspiracy, this court need only address the issue of whether he knowingly and intentionally joined the conspiracy. At the bench trial, the government presented evidence that Navarrete: (1) had been contacted by Julian Soberanis who asked him if he would deliver a package from Mexico to the United States in return for $2,000 and received instructions on how to hide the package on his person; (2) was given the name of his contact person in Chicago, Alfredo, whose telephone number was in Navarrete's wallet; (3) met with Alfredo to purchase the ticket to Mexico and met him later in the Jewel parking lot, where Alfredo was willing to exchange the package for $700. Through his own testimony, Navarrete admitted that he knew he was carrying drugs, but thought the package contained cocaine not heroin. Navarrete also testified that he was trying to rid himself of the drugs in both the Mexico City and Chicago airports to no avail.

Looking at Navarrete's overt acts, the totality of his conduct, and his interactions with the members of the conspiracy, it is apparent that he knowingly agreed to join the conspiracy. His admissions of his contacts with Julian and Alfredo, along with his presence in Mexico City and O'Hare while carrying a controlled substance shows Navarrete intended to advance the ends of the conspiracy. Navarrete even admits that he knew he was carrying a controlled substance across international borders, arguing that he was confused.

■ Specifically, Navarrete asserts that the evidence shows that he was misled into going to Mexico and that the combination of alcohol, cocaine, and sex wore down his resistance to Julian Soberanis' suggestions. Accepting the testimony of the government witnesses, the district court did not find credit in Navarrete's exculpatory testimony supporting his theory of defense, that of diminished capacity which includes intoxication. This court has previously recognized that the factfinder is free to weigh the evidence and choose between inculpatory and exculpatory

interpretations, *see United States v. Diaz,* 876 F.2d 1344, 1354–55 (7th Cir.1989), which the district court did here. This court has also noted that in order to apply voluntary intoxication as a defense, the intoxication must be so severe as to suspend all reason; being drunk or intoxicated alone is insufficient. *See United States v. Reed,* 991 F.2d 399, 401 (7th Cir.1993).[1] Navarrete has failed to present such evidence here, nor does Navarrete attempt to explain the discrepancy between his trial testimony and his other statements in which he admitted that he agreed to carry drugs into the United States.

■ Last, Navarrete maintains that he was confused and thought the package the prostitute placed on him contained cocaine. The fact that Navarrete thought he was carrying cocaine and not heroin is irrelevant. It is sufficient that Navarrete was aware he possessed some controlled substance, it is immaterial that he did not know the exact nature of the drug he was carrying. *See United States v. Herrero,* 893 F.2d 1512, 1535 (7th Cir.1990).

Viewing the facts and all reasonable inferences in a light most favorable to the government, it is clear that the government proved beyond a reasonable doubt that Navarrete knew of the conspiracy and joined in the illegal activities of carrying a controlled substance across international borders. *See United States v. Katalinich,* 113 F.3d 1475, 1480 (7th Cir.1997). Therefore, the district court is affirmed.

---

**1.** In *Reed,* this court also acknowledged that diminished capacity is a defense only to specific intent crimes, *see United States v. Reed,* 991 F.2d 399, 400 (7th Cir.1993), which conspiracy to distribute a controlled substance is. *United States v. Kellum,* 42 F.3d 1087, 1093 (7th Cir.

1994). Therefore, the government's argument that conspiracy to distribute a controlled substance is a general intent crime, and thus, the diminished capacity defense inapplicable, is misplaced.