# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 03-2056 & 03-2171

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ARTURO GARCIA PARRA and
MAGDALENA CORREA,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 02-CR-92-C—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED MARCH 29, 2004—DECIDED MARCH 29, 2005

_____

Before CUDAHY, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After conducting elaborate surveillance, a team of federal, state, and local law enforcement officials nabbed Nazario Varela, Magdalena Correa, Arturo Garcia Parra, and Luis Garcia Parra on cocaine trafficking and possession charges. (In order to keep the two Garcia Parra brothers straight, we will refer to them using their first names.) All four were indicted for conspiring to dis-

tribute and possess with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846, and for possessing with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1). Varela and Luis pleaded guilty, but Arturo and Correa went to trial and were convicted on both counts. The latter two now appeal.

Arturo has raised challenges to the admission of expert testimony regarding drug trafficking counter-surveillance techniques; the sufficiency of the evidence to sustain his conviction; and the court's refusal to reduce his offense level for having only a minor role in the conspiracy. Correa contends that the officers lacked probable cause to arrest her, and therefore the court erred in denying her motion to suppress evidence found in a search incident to her arrest. In a supplemental brief, Correa has also argued that her sentence was unconstitutional under the rule announced in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), and now *United States v. Booker*, 125 S.Ct. 738 (2005). We affirm the district court's judgment of guilt with respect to both defendants. We order a limited remand with respect to both of the sentences imposed, in keeping with the procedure outlined in *United States v. Paladino*, Nos. 03-2296 *et al.,* 2005 WL 435430 (7th Cir. Feb. 25, 2005).

# I

On June 20, 2002, Murillo Luna, a confidential source, purchased 55.18 grams of cocaine from Varela at the latter's home in Janesville, Wisconsin. Five days later, on June 25, Luna and Drug Enforcement Administration (DEA) Special Agent Bill Chamulak, acting in an undercover capacity, returned to Varela's home to purchase a quarter kilogram of cocaine. Varela asked Luna and Agent Chamulak to return in about half an hour. Shortly thereafter, officers observed Varela removing a white cooler from a brown Cadillac in front of his house. When Luna and Agent Chamulak re-

turned to the house, they noticed a white cooler with the lid removed. They purchased 248.3 grams of cocaine from Varela and then departed. Thirty-five minutes later, the brown Cadillac returned to Varela's house and officers saw an Hispanic man enter the house and then leave after approximately one minute. They also saw an unidentified passenger in the vehicle. Surveillance officers followed the brown Cadillac and observed an Hispanic man and woman exit and then reenter the vehicle, which was later located at 1503 Porter Avenue in Beloit, Wisconsin. This address was the residence of Arturo, Luis, and Correa.

On July 10, 2002 at 11:30 a.m., Agent Chamulak and Luna returned to Varela's house to negotiate the purchase of one more kilogram of cocaine. Varela made a phone call and instructed Agent Chamulak and Luna to return at 3:00 p.m., because his source had to go to Chicago to obtain the cocaine. At 12:03 p.m., an officer with the Rock County State Line Area Narcotics Task Force (SLANT) observed Luis and Arturo drive away from 1503 Porter Avenue in a white Cadillac. Six SLANT vehicles and a C-26 military aircraft followed the white Cadillac from Beloit to Chicago. Remarkably, the passengers in the Cadillac never noticed their extensive entourage. Upon arriving in Chicago, they parked their car and interacted with someone in a silver car. Luis walked between some buildings with the occupant of the silver car, while Arturo returned to the white Cadillac and opened the hood and trunk. Luis then walked around the car, including the trunk area, and Arturo closed the hood and trunk. Nineteen minutes after arriving in Chicago, they departed.

At about 4:30 p.m., the white Cadillac arrived in Janesville and parked on Main Street. Arturo and Luis checked something in the trunk and then walked to the parking lot of a Quick Stop gas station, with Arturo trailing behind Luis. Officers observed Arturo standing on the corner of Racine and Main Streets, repeatedly looking up and down the street

and toward the location of the white Cadillac. Shortly there-
after, Varela, Luna, and Agent Chamulak arrived at the
parking lot of the Mexican supermarket located across the
street from the Quick Stop. Varela got out of the vehicle and
entered the surrounding neighborhood. Nine minutes later,
the same brown Cadillac that was present at the June 25
cocaine sale drove into the Quick Stop parking lot. Luis
approached the brown Cadillac and spoke with someone
inside, later identified as Correa. The brown Cadillac then
drove into the parking lot of the Mexican supermarket.
Agent Chamulak observed Correa seated in the brown
Cadillac, with her attention focused on Luna and Varela
and on Agent Chamulak's vehicle. Surveillance personnel
observed Varela approach the passenger side of the brown
Cadillac and engage in a conversation with Correa. Varela
later testified that Correa asked him if he had received the
money from the buyer, and when he answered in the nega-
tive she commented, "This is not the way you do the deals."

As Varela and Luna walked to the white Cadillac, Correa
pulled out of the parking lot and parked on the same side of
Main Street as the white Cadillac. According to Special
Agent Jerry Becka, this position would have allowed Correa
to monitor the white Cadillac through her rear view mirror.
Varela and Luna opened the trunk of the white Cadillac and
found approximately one kilogram of cocaine there. Officers
promptly arrested Varela, Luis, and Arturo. A minute later,
Special Agent Jeanne Hehr and several other officers
arrested Correa.

Both Varela and Luis pleaded guilty to both counts of the
indictment. Varela testified for the government at Arturo's
and Correa's trial pursuant to his plea agreement. Varela
reported that he worked with Arturo in Janesville and told
Arturo that he needed money. Arturo referred Varela to Luis,
from whom Varela borrowed $2,200. When Varela was un-
able to pay back the money, he agreed to sell cocaine for
Luis. Varela testified that Luis and Correa delivered the

cocaine for the June 20 sale. Luis also provided Varela with the cocaine for the June 25 sale, using a white cooler. After this purchase, Correa called Varela to discuss whether he had obtained the money and his cut of the profits. Finally, Varela stated that Arturo told him that his brother had asked him to be at the July 10 transaction because his brother was afraid that Varela was going to steal the money.

The district court permitted the government to call Agent Becka to testify about the *modus operandi* of drug dealers, especially the use of counter-surveillance techniques, rejecting Arturo's motion *in limine* seeking to exclude this testimony. Agent Becka opined that Arturo and Correa provided counter-surveillance during the July 10 sale. The government established that Agent Becka had been a DEA special agent for over 19 years; that he had completed training at both basic and advanced agent schools and attended yearly meetings where he learned about the latest tricks of the drug trade; that he had personally purchased drugs in an undercover capacity over 125 times and provided surveillance in over 1,000 undercover operations; and that he had interviewed drug dealers at least 500 times to learn how they operate. On this basis, the court found Agent Becka qualified to testify as an expert.

At the close of the government's case and again at the end of trial, Arturo and Correa moved for a judgment of acquittal, which the court denied. The jury returned a verdict of guilty against both of them on both counts of the indictment. Arturo then objected to the presentence report, arguing that he should have been given a minor role reduction in his offense level computation on the theory that he had acted only as a lookout during the July 10 sale. The court refused to make this downward adjustment, adopting the calculations in the presentence report. Arturo now appeals from his conviction and his sentence, as does Correa.

## II

### A.  Arturo Garcia Parra

Arturo first argues that the district court erred in allowing Agent Becka to testify as an expert witness. He contends that Agent Becka's testimony did not satisfy the requirements for expert testimony established by FED. R. EVID. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate. Under that standard, we review *de novo* the question whether the district court properly applied the legal framework, and we review decisions to admit or exclude expert testimony under the rule for abuse of discretion. See *United States v. Allen*, 269 F.3d 842, 845 (7th Cir. 2001).

Expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. *Daubert* laid the foundation for this rule, which was designed to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (internal quotation marks omitted).

In applying the rule, we have recognized that "[w]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Id.* (internal quotation marks and citations omitted); see *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical

training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718; see also *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (observing that the Advisory Committee notes to Rule 702 specifically provide that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony").

The district court here properly applied Rule 702. After conducting a hearing, the court observed that "the Seventh Circuit has been extremely liberal in allowing testimony by police officers and federal agents about the use of counter-surveillance in drug transactions and about other aspects of drug transactions." The court concluded that "Agent Becka is qualified to testify as an expert about these matters," citing his formal training from agent school, including training in counter-surveillance techniques, his extensive experience as a DEA special agent, and his involvement in "many dozens, if not hundreds" of undercover purchases of controlled substances. On appeal, Arturo counters this reasoning only with the fact that Agent Becka had never previously testified as an expert on these matters.

But there is a first time in court for every expert: the question is not whether Agent Becka was a professional witness; it is whether he was an expert on the topic of the *modus operandi* of narcotics dealers. The district court was amply justified in concluding that he was. Compare *Conn*, 297 F.3d at 556. Officer Becka had the kind of experience, education, and training that we have recognized in the past as supporting a finding of expertise. See *id.*; *Allen*, 269 F.3d at 846. On several occasions, we have found that an agent's experience qualifies him or her to testify as an expert regarding drug trafficking counter-surveillance. See, *e.g.*, *United States v. Sanchez-Galvez*, 33 F.3d 829 (7th Cir. 1994); *United States v. de Soto*, 885 F.2d 354 (7th Cir. 1989). See also *United States v. Romero*, 189 F.3d 576, 584-85 (7th Cir. 1999) (stating that "*modus operandi* evidence has proved useful in drug trafficking cases," including testi-

mony "regarding various counter[-]surveillance techniques used by drug dealers to avoid detection"); *United States v. Brown*, 7 F.3d 648, 652 (7th Cir. 1993) (same).

Arturo seeks to distinguish these cases by arguing that the jury did not need the agent's testimony to understand the case. He urges that the surveillance recordings of the July 10 transaction allowed the jury to be "in effect an eyewitness to Arturo's actions" and thus it "could have determined by viewing DVD and surveillance tapes the entire scope of his alleged involvement and determined whether he was engaged in acting as a lookout or not" without Agent Becka's input. This argument fails to recognize the breadth of the district court's discretion in deciding whether to admit or exclude evidence. Moreover, we have recognized in the past that Agent Becka's type of expertise can indeed assist the trier of fact with its analysis of defendants' conduct. See *Romero*, 189 F.3d at 584; *Sanchez-Galvez*, 33 F.3d at 832. Recognizing the value of such testimony, we have allowed expert testimony describing how defendants' otherwise innocent-looking conduct was consistent with drug trafficking counter-surveillance. See *Sanchez-Galvez*, 33 F.3d at 832; *de Soto*, 885 F.3d at 360. Agent Becka's testimony regarding Arturo's activities during the July 10 transaction was valuable notwithstanding the fact that the jury had access to the surveillance tapes.

Arturo also objects to the admission of Agent Becka's testimony on the ground that he took the stand both as an eyewitness to Arturo's conduct and as an expert regarding narcotics counter-surveillance tactics. Agent Becka testified that he witnessed Arturo "looking up and down the street around and then looking back towards where I was told the white Cadillac was parked." He then explained to the jury why, in his expert opinion, this seemingly innocuous conduct indicated that Arturo was engaged in counter-surveillance. While "[t]estifying as both eyewitness and expert is permissible," we recognize that "when these two roles are

intertwined, the possibility of juror confusion is increased." *de Soto*, 885 F.3d at 360. This situation "place[s] an especially heavy burden on the district court to ensure that the jury understood its function in evaluating the evidence." *Id.* This is particularly so where, as here, the activities suggesting counter-surveillance may appear to be innocent. *Id.* at 361.

The district court was careful to avoid these pitfalls. First, because it conducted an evidentiary hearing regarding Agent Becka's qualifications as an expert, Arturo knew what to expect from him. Second, it gave the jury a cautionary instruction, in which it advised the jury to give Agent Becka's testimony "whatever weight you think it deserves"—that is to say, no special weight merely because the agent was also testifying as an expert. Finally, both counsel for Arturo and counsel for Correa engaged in rigorous cross-examination of Agent Becka regarding his expertise and the substance of his testimony.

Arturo finally argues that, even if Agent Becka's testimony was reliable and relevant, the court should have excluded it under FED. R. EVID. 403, which allows the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." According to Arturo, the real danger was either that the jury might have attached undue weight to Agent Becka's testimony or that it might not have been able to disentangle his direct observations from his expert knowledge. In *United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002), we explained why such dual testimony may be permitted, with the proper safeguards:

> Although we have acknowledged that there is a greater danger of undue prejudice to the defendants when a witness testifies as both an expert and a fact witness, we have also indicated that a police officer may permissibly testify in both capacities. The potential for pre-

> judice in this circumstance can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert.

*Id.* at 654 (internal citations omitted). As we have already noted, both of those measures were taken in this case, and thus neither Rule 702 nor Rule 403 bars Agent Becka's testimony.

We turn then to Arturo's claim that there was insufficient evidence to convict him of either the conspiracy offense or the possession with intent to distribute offense. The task of challenging the sufficiency of the evidence "is a daunting one, as the standard of review that this court applies is necessarily rigorous. Our threshold inquiry is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We begin with Arturo's conspiracy conviction. "A conspiracy conviction requires a showing that a conspiracy existed (two or more persons joined together for the purpose of committing a criminal act) and that the charged party knew of and intended to join the agreement." *United States v. Adkins*, 274 F.3d 444, 450 (7th Cir. 2001) (internal quotation marks omitted). "The government may establish these elements through circumstantial evidence and the reasonable inferences therein concerning the parties' relationships, their overt acts, and their overall conduct." *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir. 1997). Because Arturo apparently concedes that a conspiracy existed, we need determine only whether he knowingly and intentionally joined that conspiracy. Arturo contends that there is insufficient evidence to establish his involvement, citing the

absence of drugs or drug paraphernalia in his bedroom at 1503 Porter Avenue, the lack of any cellular phone records or drug ledgers linking him to the conspiracy, and his nonparticipation in the undercover transactions prior to July 10. The government counters by detailing Arturo's role in retrieving the kilogram of cocaine from Chicago on July 10 and Agent Becka's testimony that Arturo's conduct at the scene of the July 10 transaction was consistent with drug trafficking counter-surveillance. In addition, the government points to Varela's testimony that Arturo explained that he was present at the July 10 transaction because his brother thought Varela was going to steal the money.

"Although mere presence is insufficient to show that the defendant was acting in furtherance of a conspiracy, the government can prove that a defendant joined a conspiracy if his presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy is shown." *Navarrete*, 125 F.3d at 562 (internal quotation marks omitted). Our analysis in *United States v. Sasson*, 62 F.3d 874 (7th Cir. 1995), is instructive. There we found sufficient evidence to support the jury's conclusion that defendant Sasson knowingly and intentionally joined a drug distribution conspiracy by providing counter-surveillance. *Id.* at 888. Like Arturo, Sasson did not personally conduct the drug transactions, but the remainder of his behavior indicated that he was acting as a lookout. In finding the evidence sufficient to prove Sasson's involvement in the conspiracy, we explained:

> Whether a defendant's behavior constitutes counter-surveillance or simply loitering is a question of fact for the jury to decide, and the fact that Sasson did not have all the usual "trappings" of a drug dealer is not dispositive. . . . Under the circumstances and given the fact that Sasson accompanied [the dealer] to each and every one of the five drug transactions, a reasonable juror could very easily conclude that Sasson was there to serve as a "lookout" and to see that the drug deals were suc-

cessfully completed, justifying the logical inference that Sasson was an active participant in the conspiracy.

*Id.* at 887 (internal citations and quotation marks omitted).

We have repeatedly stated that "engaging solely in counter-surveillance at a drug transaction is sufficient to prove participation or membership in a conspiracy to sell drugs." *Id.*; see also *United States v. Saadeh*, 61 F.3d 510, 525 (7th Cir. 1995); *Sanchez-Galvez*, 33 F.3d at 834; *United States v. Brigham*, 977 F.2d 317, 319 (7th Cir. 1992). Viewing the evidence in the light most favorable to the prosecution, as we must, we hold that a reasonable jury could have credited Agent Becka's testimony and found that Arturo engaged in counter-surveillance on July 10. See *Navarrete*, 125 F.3d at 562-63. As "counter-surveillance at a drug transaction is sufficient to prove participation or membership in a conspiracy to sell drugs," *Sasson*, 62 F.3d at 887, Arturo cannot prevail on his insufficiency of the evidence claim with respect to his conspiracy conviction.

We likewise hold that there was sufficient evidence to support Arturo's conviction for knowingly possessing with intent to distribute cocaine. To prove this charge, "the Government had to show three things: 1) knowing or intentional possession of the drug, 2) possession with intent to distribute and 3) knowledge that the drug was a controlled substance." *United States v. Harris*, 325 F.3d 865, 868 (7th Cir. 2003). Arturo argues that there was insufficient evidence to convict him, relying primarily on the lack of direct evidence that he ever possessed the kilogram of cocaine which was the subject of the July 10, 2002, transaction.

The absence of direct evidence in no way demonstrates that there was insufficient evidence of Arturo's possession of cocaine. As we have often stated, "[i]n addition to actual possession, possession can be constructive, and constructive possession can be established through circumstantial

evidence. Constructive possession exists where the evidence demonstrates ownership, dominion, authority, or control. Constructive possession may be sole or joint." *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000) (internal citations omitted). To show constructive possession, "the government [must] establish a nexus between the accused and the contraband, in order to distinguish the accused from a mere bystander." *Id.*

On several occasions, we have found possession with intent to distribute a controlled substance when the defendant denied knowledge of drugs that were located in the car that she was driving or in which she was a passenger. See *United States v. Griffin*, 150 F.3d 778 (7th Cir. 1998); *United States v. Elizondo*, 920 F.2d 1308 (7th Cir. 1990). This case is the same. Arturo and Luis left their home for Chicago minutes after Varela called his source; they spent only 19 minutes in Chicago; they opened the trunk of the car while in Chicago and again upon arriving in Janesville, which was not their city of departure; they drove the car to several locations and walked around and near the car suspiciously; and when they arrived at the Quick Stop, Arturo positioned himself on a corner where he could monitor the car and repeatedly looked around and at the car. Ultimately, the agents seized a kilogram of cocaine from the trunk of the car. A reasonable jury was entitled to conclude that Arturo had constructive joint possession of the cocaine in the trunk of the car, arising from his "shared rights of dominion and control" over the drugs, even if he never admitted that he knew about the cocaine in the vehicle.

Finally, we turn to Arturo's argument that the district court erred in refusing to reduce his offense level based on an alleged minor role in the conspiracy. Before discussing this issue, however, we must place Arturo's appeal in context for purposes of *United States v. Booker*, *supra*, 125 S.Ct. 738. Neither before the district court nor before this court has Arturo raised any argument to the effect that the dis-

trict court's use of the Sentencing Guidelines violated the Constitution, the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely*, or *Booker*. Nonetheless, it is still within this court's discretion to recognize plain error where it occurs. See FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). For the reasons we explained in *Paladino, supra*, 2005 WL 435430, at *9, Arturo's sentence may be tainted with plain error. For the benefit of the district court on the limited remand we are ordering, however, we address Arturo's Guidelines-based argument that he should have received the minor role adjustment. This is appropriate because the Guidelines continue to have force as advisory statements even after the Supreme Court's *Booker* decision, and thus there is still a strong interest in ensuring that they are applied properly.

Section 3B1.2 of the U.S. Sentencing Guidelines provides:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

Application Note 5 defines a minor participant as one "who is less culpable than most other participants, but whose role could not be described as minimal." Before *Booker*, we reviewed the district court's decision to deny a defendant a downward adjustment for a lesser role in criminal activity under § 3B1.2 for clear error. *United States v. Hanhardt*, 361 F.3d 382, 394 (7th Cir. 2004), *vacated and remanded for further proceedings sub nom. Altobello v. United States*, 125 S. Ct. 994 (2005). We shall do the same here.

Arturo argues that he "certainly wasn't involved in the conspiracy prior to the day it all ended, July 10, 2002," and that the court therefore wrongly held him "accountable for an amount in excess of what his involvement and the record substantiates." In response, the government points to Arturo's involvement in transporting the drugs to Janesville from Chicago and acting as a lookout during the sale, as well as Varela's statements to the officers that he made a payment of a drug debt to Arturo and purchased an ounce of cocaine from him prior to the July 10 delivery. Arturo dismisses Varela's testimony as "simply incredible," but the district court found otherwise, stating: "I'm not persuaded that Mr. Varela lied about everything that he testified to at trial. I think that a certain amount of his testimony was quite believable." The court concluded that Arturo did not merit a minor role reduction because he joined the conspiracy prior to July 10, 2002, as evidenced by his introducing Varela to Luis, delivering cocaine to Varela on behalf of Luis, and accepting drug payments from Varela.

The record before us does not convince us that the district court erred in its evaluation of Arturo's role in the offense. The court's reliance on Arturo's participation in transporting the cocaine and providing counter-surveillance and Varela's testimony regarding Arturo's involvement in the conspiracy prior to the July 10 sale, which it credited, provided adequate support for its decision. See *United States v. Galbraith*, 200 F.3d 1006, 1012 (7th Cir. 2000). We have held that "[w]hen it appears that although one person was the 'driving force' in a criminal scheme, yet the defendant still had 'an integral role assisting him' in the enterprise, the defendant will not receive a reduction in his offense level pursuant to U.S.S.G. § 3B1.2(a)." *United States v. Navarro*, 90 F.3d 1245, 1263 (7th Cir. 1996). The district court reasonably could have concluded that Arturo played such an integral role, even though Luis may have orchestrated the cocaine distribution conspiracy. The court did not clearly err in refusing to grant Arturo a minor role adjustment.

## B. Magdalena Correa

Initially, Correa's sole argument on appeal was that law enforcement officials lacked probable cause to arrest her during the July 10 transaction, and hence that the district court erred in denying her motion to suppress the evidence obtained in the search of her vehicle incident to that arrest. After oral argument, we gave her permission to file a supplemental brief arguing that her Sixth Amendment right to a jury trial was violated when the district court based her sentence on facts not found by the jury, including the amount of cocaine for which she was responsible, her obstruction of justice, the use of a weapon, and her role as a leader. Correa conceded in her supplemental brief that she had not raised this issue before the district court. We consider first her arguments with respect to her arrest and the suppression of the evidence, and then her sentencing arguments.

"In order to have probable cause for an arrest, law enforcement agents must reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). The fact-intensive, on-the-spot determination of probable cause often involves an exercise of judgment, which " 'turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' " *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (quoting *Ill. v. Gates*, 462 U.S. 213, 232 (1983)). Therefore, courts evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer—* seeing what he saw, hearing what he heard." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992). "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of crim-

inal activity on the suspect's part, probable cause exists." *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000).

We review *de novo* the court's ultimate conclusion whether the law enforcement officers had probable cause. *Id.* at 679. Nonetheless, findings of historical fact are reviewed only for clear error. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). In reviewing a denial of a suppression motion, we may consider evidence introduced both at the suppression hearing and at trial. *United States v. Yang*, 286 F.3d 940, 948 n.4 (7th Cir. 2002); *United States v. Duguay*, 93 F.3d 346, 350 (7th Cir. 1996); *United States v. Trevino*, 60 F.3d 333, 336 (7th Cir. 1995).

The government contends that this case is governed by the "collective knowledge doctrine," under which "[t]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (emphasis removed); see also *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003). This doctrine is rooted in the Supreme Court's holding in *United States v. Hensley*, 469 U.S. 221 (1985), that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* at 231 (internal quotation marks omitted). Courts have applied the collective knowledge doctrine in two situations: first, when information from one jurisdiction is actually relayed to officers or agencies in another jurisdiction to permit coordination of investigations and the speedy apprehension of fleeing suspects, see *United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992), and

second, "when officers are in communication with each other while working together at a scene." *Id.* at 911; see also *Sawyer*, 224 F.3d at 680. In the latter group of cases, the knowledge of the officers may be imputed to one another "even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop or arrest)." 974 F.2d at 911.

To apply the collective knowledge doctrine here, we must determine first what knowledge can be imputed to the officers at the time that they arrested Correa, and second whether that knowledge was sufficient for the officers to form a reasonable belief that she was engaged in criminal activity. When Correa was arrested, the team of officers at the scene had the following information regarding her in-volvement in the drug transaction: (1) on July 10, 2002, she departed from 1503 Porter Avenue, the residence that she shared with Arturo and Luis; (2) she drove the same brown Cadillac (with the same license plate) as that parked in front of Varela's house during the June 25, 2002 drug transaction; (3) when the brown Cadillac returned to Varela's house after the delivery of the cocaine to the undercover agents, an Hispanic woman was in the passenger seat; (4) on July 10, agents followed Correa from 1503 Porter Avenue to the Quick Mart, where she spoke briefly to Luis; (5) she then spoke briefly with Varela in the Mexican supermarket's parking lot, immediately prior to his leading Luna to the trunk of the white Cadillac; and (6) after this exchange and before Varela revealed the cocaine, she parked the brown Cadillac where it would be possible for her to monitor the trunk of the white Cadillac through her rearview mirror.

We find this evidence sufficient for an officer to have formed "a reasonable belief to suspect criminal activity" on the part of Correa. In these situations, "law enforcement

agents are entitled to draw reasonable inferences from the facts before them, based on their training and expertise." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). As in *Funches*, the agents here had extensive experience in narcotics enforcement, which is relevant to an informed assessment of the facts. See generally 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.2(c), at 38 (3d ed. 1996).

Agent Becka and Agent Hehr testified that they each have 19 years of experience as DEA agents, with the latter serving as the resident agent in charge of the DEA office in Madison, Wisconsin. Trained narcotics officers like these two, who observed Correa's activities in this case, could reasonably conclude that she was engaged in counter-surveillance during the July 10 transaction, based on the facts we have just reviewed. See *United States v. Carpenter*, 342 F.3d 812, 815 (7th Cir. 2003); see also *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991). We therefore find that the totality of the circumstances, when considered in light of the DEA agents' training and experience, gave them sufficient reason to believe that there was a significant probability that Correa was committing a crime. See *United States v. Carrillo*, 269 F.3d 761, 767 (7th Cir. 2001).

Having found sufficient evidence in the aggregate to establish probable cause for Correa's arrest, we must determine whether this information can be imputed to the officers who arrested her. Although we do not know who issued the order for Correa's arrest and the precise information in the minds of the officers who carried it out, the record shows that the officers conducting surveillance during the July 10 transaction were in close communication with each other. Agent Becka, who also provided surveillance during the June 25 undercover transaction at which the brown Cadillac was observed, testified that during the July 10 transaction he shared a surveillance van with Agent Jeanne Hehr, who arrested Correa, and two other officers. Agent Hehr testified that she received "numerous cellular

phone calls throughout the transaction" from other officers, reporting the activities and locations of the parties and the arrest of Varela and Luis. In addition, Agent Becka confirmed that Agent Chamulak, who was at the scene of the July 10 transaction in an undercover capacity, radioed to Agents Becka and Hehr that Correa had repositioned her car so as to monitor the white Cadillac. Finally, Special Agent Edward Wall of the Division of Narcotics Enforcement for the Wisconsin Department of Justice, who conducted aerial surveillance of the trip to Chicago and the subsequent transaction in Janesville, including the movements of the brown Cadillac, testified that he was in communication with the surveillance team on the ground via radio.

This team of officers therefore worked together closely in monitoring the drug transaction as it unfolded. In such a case, we have found that the officers' "knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Nafzger*, 974 F.2d at 911; see also *United States v. Edwards*, 885 F.2d 377, 383 (7th Cir. 1989); *Sawyer*, 224 F.3d at 680. In particular, the team of officers monitoring the July 10 transaction were in close contact throughout. Agent Hehr, who arrested Correa, was in constant communication with Agent Becka and Agent Chamulak. On this basis, we find the collective knowledge doctrine applicable, and given that the information available to the officers at the time of Correa's arrest provided probable cause, we affirm the district court's denial of her motion to suppress.

We now turn to Correa's challenge to her sentence. In keeping with our decision in *Paladino*, 2005 WL 435430, we review Correa's arguments under *Blakely/Booker* for plain error. Because there is nothing out of the ordinary about her case, compare *United States v. Lee*, 399 F.3d 864 (7th Cir. 2005), we conclude that Correa is also entitled to a limited remand to ascertain whether the district court

would have imposed the same sentence had it realized that the Guidelines were advisory only.

Correa's sentence depended in large part on the district court's application of the Guidelines. As she points out, the indictment in her case charged her with offenses involving "more than" 500 grams of a substance containing cocaine. It did not charge that she played a leadership role in the conspiracy, that she possessed a dangerous weapon, or that she obstructed justice. The jury therefore never made any of the latter three findings, nor can one say whether it found any *more* than a smidgeon over 500 grams of the controlled substance. The district court, proceeding naturally enough under the Guidelines, found that Correa should be responsible for 1.56 kilograms of cocaine. See U.S.S.G. § 1B1.3. It also found that she possessed a dangerous weapon in connection with the offense and raised her Guidelines offense level by two on that basis, see U.S.S.G. § 2D1.1(b)(1); it found that she played a leadership role and accordingly raised her offense level by another two, see U.S.S.G. § 3B1.1(c); and it found that she had obstructed justice and thereby earned a final two-level increase under U.S.S.G. § 3C1.1. These adjustments for relevant conduct and other factors resulted in an increase in her offense level from a 26 to a 32, and changed the sentencing range from 63 to 78 months up to 121 to 151 months. The district court sentenced her at the bottom of the adjusted range, to 121 months.

Particularly in this kind of case, we do not know if the judge, sentencing with the new flexibility afforded by *Booker*, would have concluded that 121 months was a "reasonable" sentence. In order to guide the court's deliberations on the limited remand, however, we comment briefly on the points related to the application of the Guidelines that Correa has already raised.

*Relevant Conduct*. The jury found that Correa was responsible for more than 500 grams of cocaine, while the

court concluded that the exact amount for which she should be held responsible was 1.56 kilograms. Because that amount was less than two kilograms, it did not increase the offense level that followed from the jury's verdict. See U.S.S.G. § 2D1.1(c)(7).

*Weapon.* The court found that Correa had two weapons, and that it was not "clearly improbable that the weapon(s) [were] connected with the offense." See U.S.S.G. § 2D1.1(b)(1) and Application Note 3. One was a gun found under the mattress in her bedroom, and the other was a gun she kept in her purse. The court noted that she was selling drugs out of the house, and thus that it could not say that the guns had no connection with the offense. It also found that she had displayed a firearm to co-conspirator Varela to intimidate him. We see no clear error in these factual findings, whatever their relevance may be to the ultimate reasonable sentence.

*Role in the Offense.* Initially, the government urged that Correa receive a four-level upward adjustment in her sentencing level for a leadership role in the conspiracy, pursuant to U.S.S.G. § 3B1.1(a). In the end, however, the court imposed only a two-level upward adjustment under § 3B1.1(c), which is available for someone who is an "organizer, leader, manager or supervisor" in a capacity other than those covered by the higher enhancements. The court was concerned that the government had not adequately shown that the activity involved five or more participants, which is required for the four-level enhancement. On this point, the court gave Correa the benefit of the doubt. It found that she was at least a manager or supervisor of the group's activities, along with Luis. That finding is supported in the record, should the judge consider it appropriate once again to take this factor into account.

*Obstruction of Justice.* This enhancement under U.S.S.G. § 3C1.1 is perhaps the easiest to support in the record. The

district court found that Correa had lied at the trial when she testified that she had no knowledge of the drug trafficking conspiracy. The jury's verdict, among other things, squarely contradicts her assertion. (The jury did not find the other elements of an obstruction offense, and so we assume that its apparent conclusion that Correa was untruthful is not the end of this argument.) The court also found that she lied when she said that the drug ledger did not belong to her, but instead was Luis's exclusive property, and when she claimed that she was not acting as a lookout for the sale. Again, the jury's findings strongly contradict these assertions. Defendants who obstruct justice are particularly culpable, as both common sense and the Guidelines recognize. This factor may also play a part in the offense level computed for purposes of an advisory use of the Guidelines.

# III

For these reasons, we AFFIRM the district court's denial of Correa's motion to suppress and the judgment of guilt with respect to Arturo Garcia Parra. We order a LIMITED REMAND with respect to both sentences, while retaining jurisdiction, in accordance with the procedure set forth in *Paladino.*

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*